COURT OF APPEALS OF VIRGINIA

Present:  Chief Judge Decker, Judges O'Brien and Lorish
Argued at Lexington, Virginia

UNPUBLISHED

RYAN MITCHELL ALLEN

v.      Record No. 1247-22-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
CHIEF JUDGE MARLA GRAFF DECKER
AUGUST 15, 2023

FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
Stacey W. Moreau, Judge

James C. Martin (Martin & Martin Law Firm, on briefs), for
appellant.

Liam A. Curry, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Ryan Mitchell Allen appeals his conviction for the felony offense of driving under the

influence of alcohol as a repeat offender in violation of Code §§ 18.2-266 and -270.  He suggests

that the trial court erred in three ways, by: denying his motion to suppress evidence, admitting a

certificate of blood alcohol analysis over his chain-of-custody objection, and concluding the

evidence was sufficient to support his conviction.[1]  We hold that the trial court did not err in any of

the ways suggested.  As a result, we affirm the conviction.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The appellant also initially assigned error on a fourth ground, alleging that convicting
him of "felonious subsequent-offense [DUI]" was error because his driving rights had been
restored.  He has since withdrawn that claim.

BACKGROUND[2]

On the afternoon of October 25, 2020, Investigator Anthony Rouse of the Pittsylvania County Sheriff's Office learned that homeowners at a particular address complained that their driveway was blocked by a vehicle whose occupant was "passed out behind the wheel." The investigator was further advised that the homeowners did not recognize the vehicle or the occupant. Rouse and Pittsylvania Sheriff's Deputy Justin Turner went to the residence, which was located in a wooded area with only a winding, one-lane driveway visible from the road. The officers, who were in uniform, recorded their encounter with the appellant using their body-worn cameras.

Deputy Turner approached the unidentified vehicle, which was a Ford station wagon, and called in its license plate number. Dispatch notified him that the license plate was registered at a different address than the driveway in which the car was parked and that the plate was for use on a different vehicle, a Dodge.

The Ford's engine was running, the driver's window was partially down, and the radio was on. The man in the driver's seat was alone in the vehicle and was either asleep or unconscious. He gave no indication that he was aware of the officers' presence, despite loud noises emanating from their police radios. Deputy Turner called out to the man, but he did not move or respond in any way.

Investigator Rouse opened the driver's door, turned off the ignition, and again spoke to the man. At that point, the driver woke up but was "obviously . . . disoriented." When Rouse

---

[2] Under the applicable standard of review, this Court considers the evidence "in the light most favorable to the Commonwealth, the prevailing party in the [trial] court," and "accord[s] it the benefit of all reasonable inferences deducible from the evidence." *Rich v. Commonwealth*, 292 Va. 791, 799 (2016) (quoting *Riley v. Commonwealth*, 277 Va. 467, 482-83 (2009)) (sufficiency); *see Williams v. Commonwealth*, 71 Va. App. 462, 472 n.2 (2020) (suppression and admission of evidence).

asked why he was "passed out behind the wheel," the man said he was tired. At that time, his speech was slurred.

Rouse's discussion with the driver revealed that he "didn't really know where he was." When Rouse first asked him about his location, he mumbled "family" almost inaudibly and later said he was in "[his] family's driveway." Investigator Rouse told him that the people who lived there did not know him. Both officers noticed that he had "glossy" eyes and smelled of alcohol.

The man identified himself as the appellant and got out of the car. Rouse asked him for identification and also inquired whether he had any "weapons" or "anything like that" in his pockets. The appellant said that he did not. Rouse patted him down and asked if he could "grab" the appellant's wallet. The appellant agreed, and Rouse retrieved the wallet from his pants pocket. While removing the wallet, Rouse "s[aw]" a syringe in the pocket. Rouse removed the syringe, which contained an unknown liquid.

The appellant's explanation for his possession of the syringe evolved. He first denied any knowledge of it, then claimed he was a "borderline" diabetic, and finally admitted that he did not have a prescription for any medications or "needles." Rouse searched the same pocket where he found the syringe and discovered a folded piece of paper. It contained a tan powder that he suspected was an illegal drug. When Deputy Turner asked the appellant when he had last used drugs, the appellant replied that "this [was] the first time" he had "used" in years.

After discovering the suspected drugs, the officers searched the car. Investigator Rouse found a grocery bag containing two cold cans of beer. The appellant admitted that he had consumed alcohol before driving. Deputy Turner then performed the horizontal gaze nystagmus (HGN) test on the appellant. Upon completing the test, Turner told the appellant that his eyes

were "really jumping" on all six parts of the test, indicating intoxication.[3]  The appellant was arrested for driving under the influence of alcohol (DUI).

Deputy Turner and Investigator Rouse drove the appellant to the hospital to have blood drawn for a determination of his blood alcohol concentration (BAC).  Pursuant to a search warrant, a hospital nurse drew the appellant's blood using a Department of Forensic Science (DFS) blood test kit that Deputy Turner provided to her.[4]  The kit containing the appellant's blood sample was sent to a DFS laboratory for testing.  Testing of the sample yielded a BAC of "$0.185 \pm 0.010\%$ by weight by volume."

The appellant was indicted for driving under the influence of alcohol after having been convicted of a felony offense under Code §§ 18.2-266 and -270.  He made a motion to suppress the evidence obtained by police during their detention and searches of his person and his car, as well as from the blood sample obtained with a warrant.  The trial court denied the motion.

At trial, the court admitted evidence of the blood test result over the appellant's chain-of-custody objection.  It also denied the appellant's motions to strike the evidence as insufficient to prove that he was intoxicated.  After convicting the appellant of felony DUI, subsequent offense, the court sentenced him to five years in prison with three years and four months suspended.[5]

---

[3] Deputy Turner explained, based on both his training and his administration of the HGN test on prior occasions, that if a subject "show[s] all six clues," the person's blood alcohol concentration would "in general" be above the legal limit of 0.08%.  *See* Code § 18.2-266 (setting the legal limit).

[4] All events at the hospital, like those at the scene, were recorded by the officers' body-worn cameras.

[5] Simultaneously with the DUI offense, the appellant was tried for possessing fentanyl. The court found the evidence sufficient to convict him but gave him first-offender status and placed him on probation for it.  The drug offense is not before this Court.

ANALYSIS

The appellant contests the trial court's ruling denying his motion to suppress evidence. He also challenges its admission of the certificate of blood alcohol analysis into evidence. Finally, he suggests that the court erred by holding the evidence was sufficient to prove he drove while under the influence of alcohol.

## I. Denial of the Motion to Suppress

The appellant contends that the trial court erroneously denied his motion to suppress.[6] First, he asserts that the officers did not have reasonable suspicion or probable cause to detain, search, and arrest him, or to search his vehicle. Second, the appellant argues that the officers erred by failing to advise him of Virginia's implied consent law before drawing his blood pursuant to a warrant.

In reviewing the denial of a motion to suppress evidence based on an alleged violation of Fourth Amendment rights, the appellant bears the burden of establishing that reversible error occurred. *Glenn v. Commonwealth*, 275 Va. 123, 130 (2008). The appellate court, in reviewing the record, considers "evidence adduced at both the trial and the suppression hearing." *Carlson v. Commonwealth*, 69 Va. App. 749, 758 (2019) (quoting *Greene v. Commonwealth*, 17 Va. App. 606, 608 (1994)). Further, it examines the trial court's application of the law de novo, including its assessment of whether reasonable suspicion or probable cause supported a search. *Brooks v. Commonwealth*, 282 Va. 90, 94-95 (2011); *see Kyer v. Commonwealth*, 45 Va. App. 473, 479 (2005) (en banc).

---

[6] We assume without deciding that the appellant properly presented this claim for appeal. *See McGinnis v. Commonwealth*, 296 Va. 489, 501 (2018) (holding that in a case in which "the ability of the Court to review an issue on appeal is in doubt," the court "may 'assume without deciding' that the issue can be reviewed" if it allows the court "to resolve the appeal on the best and narrowest ground[]"). *See generally* Rule 5A:20(e) (providing that the appellant's opening brief "must contain . . . the argument (including principles of law and authorities) relating to each assignment of error").

Regardless of the ultimate legal conclusion, however, the appellate court defers to the trial court's "findings of historical fact unless 'plainly wrong' or without evidence to support them." *McGee v. Commonwealth*, 25 Va. App. 193, 198 (1997) (en banc). "This standard requires [the reviewing court] 'to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" *Commonwealth v. White*, 293 Va. 411, 414 (2017) (quoting *Evans v. Commonwealth*, 290 Va. 277, 280 (2015)). The factual findings to which the court must defer include the trial court's assessment of the credibility of the witnesses. *McCary v. Commonwealth*, 36 Va. App. 27, 35 (2001). Those findings also include the trial court's view of video evidence. *Meade v. Commonwealth*, 74 Va. App. 796, 805-06 (2022), *cited with approval in Commonwealth v. Barney*, ___ Va. ___, ___ (Mar. 16, 2023). When the trial court has not made specific findings of fact on an issue, we view the relevant evidence in the light most favorable to the Commonwealth and afford it the benefit of all inferences fairly deducible from that evidence. *See Mason v. Commonwealth*, 291 Va. 362, 367 (2016).

We apply these well-established legal principles when examining the appellant's assignment of error regarding the suppression motion.

A. Reasonable Suspicion and Probable Cause

The appellant contends that the officers lacked reasonable suspicion to stop and detain him. He also argues that they did not have probable cause to search him or his vehicle. Finally, he suggests that they acted without probable cause to arrest him and to obtain a search warrant for his blood.

Reasonable suspicion must be more than an "unparticularized suspicion or 'hunch.'" *Bass v. Commonwealth*, 259 Va. 470, 475 (2000) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). Nonetheless, it "requires only 'some minimal level of objective justification.'" *Hairston v. Commonwealth*, 67 Va. App. 552, 561 (2017) (quoting *Branham v. Commonwealth*, 283 Va.

- 6 -

273, 280 (2012)). Probable cause exists when the facts and circumstances "are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed." *Park v. Commonwealth*, 74 Va. App. 635, 646 (2022) (quoting *Al-Karrien v. Commonwealth*, 38 Va. App. 35, 47 (2002)). "It involves a much lower evidentiary standard than proof beyond a reasonable doubt." *Id.*

In determining whether reasonable suspicion or probable cause existed, the court considers the "totality of the circumstances." *Mason*, 291 Va. at 368 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (assessing reasonable suspicion); *see Curley v. Commonwealth*, 295 Va. 616, 622 (2018) (assessing probable cause). Although both reasonable suspicion and probable cause must be based on "articulable facts of criminal activity," the officer need not articulate those facts expressly or subjectively rely on them as the basis for his actions. *See Mason*, 291 Va. at 368; *Raab v. Commonwealth*, 50 Va. App. 577, 583 n.2 (2007) (en banc). Rather, the record must establish the existence of objective facts proving reasonable suspicion or probable cause, depending on which standard is required. *See Raab*, 50 Va. App. at 583 n.2; *Whren v. United States*, 517 U.S. 806, 812-13 (1996). "Also, because the constitutional standard is one of objective rather than subjective reasonableness, it is irrelevant whether the accused is prosecuted for, or even charged with, the offense that provided [reasonable suspicion or] probable cause for . . . [the search or] seizure in the first instance." *Hairston*, 67 Va. App. at 563.

It is a fundamental principle that an officer who has reasonable suspicion of criminal activity is permitted to briefly detain a vehicle and its occupants in order to confirm or dispel his suspicion that a crime has been or is being committed. *Id.* at 562, 564. It is equally clear that if probable cause to believe the individual has committed a criminal offense develops during the detention, the officer may arrest him and "search him incident to that arrest." *See Slayton v. Commonwealth*, 41 Va. App. 101, 108 (2003) (citing *United States v. Robinson*, 414 U.S. 218,

224 (1973)). The officer also may obtain a sample of an accused's blood and have it tested for alcohol content pursuant to a valid warrant issued upon probable cause. *See Schmerber v. California*, 384 U.S. 757, 770 (1966), *cited with approval in Missouri v. McNeely*, 569 U.S. 141, 148 (2013); *cf. Aponte v. Commonwealth*, 68 Va. App. 146, 162-63 (2017). Finally, the officer may search the arrestee's vehicle "where it is '"reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle."'" *McGhee v. Commonwealth*, 280 Va. 620, 625 (2010) (quoting *Arizona v. Gant*, 556 U.S. 332, 343 (2009)).

Based upon these legal principles, the facts in the instant case entirely support the officers' actions. Here, the evidence before the trial court, viewed under the proper standard, establishes that the officers had reasonable suspicion to detain the appellant when they first approached his stationary vehicle. It was parked in the private driveway of homeowners who did not know the appellant, blocking access to their home. The officers, who were dispatched to the location, were aware that the license plate on the appellant's Ford was registered to a wholly different vehicle that was registered to a different address. When the officers went to the driver's door, he was asleep or unconscious in the running station wagon, and he did not respond to loud noises or the officers' original attempts to speak with him. Once the two officers on the scene managed to rouse him, he was "obviously . . . disoriented" and spoke with slurred speech. They also noticed that the appellant had "glossy" eyes and smelled of alcohol.

These circumstances provided the officers with reasonable suspicion, at the very least, to investigate further to determine whether the appellant was committing a variety of offenses, including trespassing, a vehicle licensing violation, and a DUI offense. *See Raab*, 50 Va. App. at 582-83 (reasonable suspicion of trespassing offense); *Lawrence v. Commonwealth*, 40 Va. App. 95, 100 (2003) (reasonable suspicion of vehicle licensing violation); *Sarafin v. Commonwealth*, 288 Va. 320, 326-27 (2014) (holding that a person behind the wheel of a vehicle with the key in

the ignition can be guilty of DUI); *Wallace v. Commonwealth*, 32 Va. App. 497, 505 (2000) (holding that detecting the odor of alcohol on a vehicle's driver provides reasonable suspicion to administer field sobriety tests).[7]

The additional information gathered by the officers as they interacted with the appellant confirmed rather than dispelled their suspicions that he was violating the law by driving while under the influence of alcohol or drugs. While obtaining his identification, one of the officers found a syringe with liquid in it and a folded piece of paper containing a suspected illegal drug. The appellant admitted he was not a diabetic and did not have a prescription for the full syringe. He also told the officers that "this [was] the first time" he had used drugs in years.

Based on the discovery of the syringe and tan powder, as well as the appellant's admissions, the officers had probable cause to arrest him for illegal drug possession. That probable cause to arrest provided them with justification to search his car for additional evidence of that crime, during which they discovered two cold cans of beer, evidence of a DUI offense. And the results from the appellant's horizontal gaze nystagmus test supplied additional evidence of intoxication. These facts, as well as the officers' observations that he smelled of alcohol, had "glossy" eyes, and was either passed out or asleep and disoriented upon waking, provided probable cause to arrest him for driving while intoxicated.

Finally, the same probable cause that supported the arrest of the appellant for driving under the influence of alcohol also supported the issuance of the search warrant to draw and test

---

[7] Contrary to the appellant's assertion, the officers were not constitutionally limited to acting in a community caretaking function because he was on private property. Virginia precedent provides that an intoxicated person who is behind the steering wheel of a vehicle with the key in the ignition *while the car is located on private property* can, in fact, be "guilty of operating the vehicle while under the influence of alcohol within the meaning of Code § 18.2-266." *Sarafin*, 288 Va. at 327-30 (quoting *Enriquez v. Commonwealth*, 283 Va. 511, 517 (2012)).

his blood.[8] *See Schmerber*, 384 U.S. at 770-71; *cf. Wolfe v. Commonwealth*, 67 Va. App. 97, 105-06 (2016) (holding that the same probable cause that supported the defendant's arrest for driving while intoxicated also supported a warrantless blood draw based on implied consent).

In light of the evidence and the way in which it developed, the officers had reasonable suspicion to detain the appellant and then probable cause to search him and his vehicle. Similarly, we conclude that the officers had probable cause to arrest him and obtain a search warrant for his blood. Consequently, the trial court did not err by denying the motion to suppress evidence.

### B. Implied Consent

The appellant argues that because his station wagon was on private property, he was not required to submit to a blood test. He claims that forcing him to do so, without advising him of Virginia's implied consent law, required exclusion of the test result, despite the fact that the police had a warrant.

Virginia's implied consent statute provides, in pertinent part, that any person "operat[ing] a motor vehicle *upon a highway*" "shall be deemed . . . to have consented" to a breath or blood test to determine his blood alcohol content if he is arrested for any one of various enumerated offenses involving driving under the influence. Code § 18.2-268.2(A) (emphasis added). Here, it is undisputed that the appellant was not operating the station wagon on a highway and was instead parked on private property when the police encountered him. Accordingly, the implied consent statute did not apply. And contrary to his suggestion, this inapplicability of the implied consent provision did not prevent law enforcement from obtaining a blood sample pursuant to a valid search warrant.

---

[8] The appellant's only objection to the issuance of the search warrant is his claim that the evidence that the officers had for the search warrant was the "same . . . insufficient evidence" they had to establish probable cause for a DUI arrest.

Settled principles of statutory construction provide that a court may not add language to a statute. *Henthorne v. Commonwealth*, 76 Va. App. 60, 67 (2022); *see Kim v. Commonwealth*, 293 Va. 304, 317 (2017). Additionally, statutes must be construed in harmony wherever possible. *See Fitzgerald v. Commonwealth*, 61 Va. App. 279, 285 (2012).

Nothing in Virginia's implied consent statute states or even suggests that law enforcement may obtain a breath or blood sample from an individual *only* by means of that statute and no other statute or authorizing legal principle. Coexisting with the implied consent statute is Virginia's warrant statute, Code § 19.2-56. That statute permits an authorized judicial officer to issue a search warrant upon a showing of probable cause. And well-settled constitutional principles permit law enforcement to seize an accused's blood and have it tested for alcohol content pursuant to a valid warrant issued upon probable cause. *See Schmerber*, 384 U.S. at 770 (requiring a warrant, "absent an emergency," where "intrusions into the human body are concerned" for purposes of testing a defendant's blood for alcohol content); *cf. Aponte*, 68 Va. App. at 162-63 (in a traffic accident case, upholding a warrantless blood test based on probable cause and exigent circumstances when the three-hour window to which implied consent applied had passed). Finally, since 2017, Code § 18.2-269(A) has expressly recognized the admissibility of test results from blood drawn pursuant to a search warrant in certain DUI prosecutions. *See* 2017 Va. Acts ch. 623.[9]

Consequently, under settled principles of statutory construction and established law, the implied consent statute does not supplant the ability of an officer to obtain a search warrant for a defendant's blood or breath in circumstances not covered by implied consent, such as when an

---

[9] Code § 18.2-269(A), which contains several rebuttable presumptions potentially applicable in the prosecution of various driving offenses, specifically provides that if all listed conditions are met, those presumptions "shall" apply based on tests "performed by [DFS] . . . on the suspect's whole blood *drawn pursuant to a search warrant*." (Emphasis added).

individual has been detained for his behavior on private property rather than a public highway. Implied consent has no relevance to the lawfulness of the seizure and search of the appellant's blood pursuant to a valid search warrant. Investigator Rouse and Deputy Turner did not advise the appellant of Virginia's implied consent law because it simply did not apply and has no bearing on this case.[10]

As a result, the alleged failure to advise the appellant of implied consent principles when his blood was obtained pursuant to a valid warrant did not render the court's ruling on the motion to suppress erroneous.

## II. Admission of the Certificate of Blood Alcohol Analysis

The appellant challenges the proof of two different "links" in the chain of custody of the certificate of blood alcohol analysis. First, he contends that the way in which the blood was drawn and packaged at the hospital did not meet the standard for admissibility on chain-of-custody grounds. Second, he argues that the evidence of who tested the sample at the DFS lab was deficient and rendered the results inadmissible on those same grounds.

We begin our analysis with the standard of review. Decisions regarding the admissibility of evidence lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of that discretion. *Herndon v. Commonwealth*, 280 Va. 138, 143 (2010). "This bell-shaped curve of reasonability [guiding] appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Minh*

---

[10] This Court's en banc decision in *Stevens v. Commonwealth*, 44 Va. App. 122, 135 (2004), *adhered to upon reh'g en banc*, 46 Va. App. 234, 247 (2005), *aff'd*, 272 Va. 481 (2006), cited by the appellant, does not require a different result primarily for two reasons. First, the Supreme Court affirmed *Stevens* on harmless error grounds without addressing whether "any error" actually occurred. *See* 272 Va. at 485-86. Second, *Stevens* involved a warrantless blood draw "independently performed by hospital personnel," as well as blood drawn and tested at the request of law enforcement. *See* 272 Va. at 485-87 & n.2; 46 Va. App. at 241-42, 249. Therefore, this Court's holding in *Stevens* is inapplicable in this case.

*Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016) (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)).  A reviewing court can conclude that "an abuse of discretion has occurred" only in cases in which "reasonable jurists could not differ" about the correct result.  *Commonwealth v. Swann*, 290 Va. 194, 197 (2015) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).  "This deferential principle applies not only to 'matters of witness credibility' but also to the factfinder's 'interpretation of all of the evidence, including video evidence' presented at trial." *Barney*, ___ Va. at ___ (quoting *Meade*, 74 Va. App. at 806).  Once "[t]he factfinder 'views video and other evidence to determine what it believes happened,'" the appellate court reviews that evidence "'for the limited purpose of determining whether any rational factfinder could have viewed it as the [factfinder] did.'"  *Id.* at ___ (second alteration in original) (quoting *Meade*, 74 Va. App. at 806).

The appellant's chain-of-custody challenges involve authentication.  "[A]uthentication does not set a high barrier to admissibility[] and is generally satisfied by any form of proof that supports a finding that [the evidence] is what it purports to be."  *Atkins v. Commonwealth*, 68 Va. App. 1, 9 (2017) (first alteration in original) (quoting Charles E. Friend & Kent Sinclair, *The Law of Evidence in Virginia* § 17-1, at 1164 (7th ed. 2012)).  A court must find any facts upon which the admissibility of evidence depends, such as those meeting authentication requirements, by a preponderance of the evidence.  *See Hicks v. Commonwealth*, 71 Va. App. 255, 275 (2019) (citing *Bloom v. Commonwealth*, 262 Va. 814, 821 (2001)); Va. R. Evid. 2:901.

"When the Commonwealth seeks to introduce evidence regarding the chemical properties of an item, the burden is upon the [prosecution] to show with reasonable certainty that there has been no alteration or substitution of the item."  *Herndon*, 280 Va. at 143.  This burden, however, "is not absolute."  *Id.*  The Commonwealth need not "exclude every conceivable possibility of substitution, alteration, or tampering."  *Pope v. Commonwealth*, 234 Va. 114, 121 (1987), *quoted*

*with approval in Herndon*, 280 Va. at 143. Instead, it must "establish each vital link in the chain of custody by showing the possession and handling of the evidence from when it is obtained to its presentation at trial." *Herndon*, 280 Va. at 143. When the issue concerns the admissibility of a certificate of blood analysis in a DUI case, a specific statutory scheme governs critical aspects of the process. *See* Code §§ 18.2-268.1 to -268.12. But the statutory steps for collecting blood evidence are "procedural and not substantive," and blood evidence gathered in "[s]ubstantial compliance" with these requirements is admissible. Code § 18.2-268.11.

We examine the challenges to the admission of the certificate of analysis with these legal principles in mind.

### A. Hospital Blood Withdrawal

The appellant suggests that the "blood draw" procedure was deficient because the evidence did not "meet the authentication requirement as to [the] qualifications" of the person who drew his blood "and how she did the draw." He asserts that Lori Crouch "stated repeatedly on the video that she had never withdrawn blood before" and also that "the white piece of paper that the officer said was in the box" was not there. Lastly, the appellant argues that the trial court described what the nurse used to clean his arm as "beta iodine," that "[sic]" appeared in the transcript after the word, indicating an unknown solution, and therefore that the Commonwealth did not prove substantial compliance with statutory requirements.

First, the record contains sufficient evidence to support the trial court's factual finding that the person who drew the appellant's blood was a registered nurse, who met the statutory qualification requirement. *See* Code § 18.2-268.5 (listing a registered nurse as qualified). As to the actual drawing of the blood, consistent with Investigator Rouse's testimony, the videos show that the person who drew the appellant's blood used the white DFS test kit that the officers provided. She also completed a "certificate of blood [with]draw[al] for alcohol determination"

- 14 -

and attached the certificate to the vial as required by Code § 18.2-268.6.  Then, when the blood was tested at the DFS laboratory, the certificate of blood withdrawal was affixed to the certificate of analysis produced by the lab, as directed by Code § 18.2-268.7(A).  From the officers' body-worn camera footage and the notations on that blood withdrawal form, the trial court found that the appellant's blood was taken by "Lori A. Crouch RN," a registered nurse and therefore an authorized person under Code § 18.2-268.5.  This finding is supported by the record and is not plainly wrong.

The record also supports the trial court's rejection of the appellant's claim that Nurse Crouch said she had never drawn blood before.  Instead, the video evidence proves that what the nurse said was that she had never before drawn blood *for law enforcement for a blood alcohol test*.[11]  Further, the appellant's allegation concerning the nurse's reference to the missing "white paper" does not render the certificate inadmissible.  He points to the nurse's isolated statement that, as he characterizes it on brief, "the white piece of paper that the officer said was in the box was not in fact in the box."  But the appellant does not explain the significance of the paper or its absence.  Rouse described the paper as simply calling for a brief statement about "what happened."  Turner noted that its absence was "no big deal."  Detailed information about "what happened" both at the scene and the hospital was readily available from testimony, the body-worn camera videos, and the police report.  In the absence of additional competing evidence and argument regarding the missing paper, the appellant's passing reference to it does not defeat a finding of substantial compliance.  *See* Code § 18.2-268.11.  This conclusion is particularly true in light of the videos, viewed by the trial court, which show the nurse's careful attention to detail before, during, and after she drew the blood.

---

[11] We note that even if this claim were true, that fact would go to the weight of the evidence rather than to its admissibility.  *Cf.* Code § 18.2-268.11.

- 15 -

Finally, the appellant's claim that the certificate of analysis was inadmissible because the record did not establish that Nurse Crouch used a substance approved by Code § 18.2-268.5 to clean his arm also fails. The fact that the transcript indicates that the judge may have referred to the substance as "beta iodine" is not dispositive. The officers' body-worn camera footage clearly indicates that Crouch confirmed in the video that she used "Betadine" on the appellant's arm.[12] The appellant himself referred to the product she was using as "Betadine," and the nurse confirmed it. Betadine is a brand name for povidone-iodine, a "topical anti-infective," which is one of the cleaning solutions specifically authorized for use by Code § 18.2-268.5. *See Betadine*, *Sloane-Dorland Annotated Medical-Legal Dictionary* (Supp. 1992); *Povidone-iodine*, *id.* This evidence distinguishes the appellant's case from *Hudson v. Commonwealth*, 21 Va. App. 184, 186 (1995), in which the only evidence was that the defendant's arm was cleaned with a "benadine solution," which this Court held was "an unknown solution" not listed in the statute. Unlike the "benadine" at issue in *Hudson*, Betadine is an alcohol-free, statutorily authorized cleaning solution. *See* 5 David L. Faigman et al., *Modern Scientific Evidence: The Law and Science of Expert Testimony* § 39.64 (2022-2023 ed.) (describing Betadine as "a non-alcohol containing antiseptic").

None of the appellant's challenges to the manner in which the blood was drawn establishes that the trial court erred by admitting the certificate of analysis because a vital link in the chain of custody was missing. Instead, the trial court properly found that the Commonwealth substantially complied with the statutory scheme, and the certificate was properly admitted.

---

[12] The trial court's presumed finding from the bench that the substance was "beta iodine" may be a typographical error in the transcript. Nonetheless, an appellate court "must rely on the transcript as certified to us by the trial court." *Huntt v. Commonwealth*, 212 Va. 737, 738 n.2 (1972). Based on the clear conflict between the videos and the transcript, we conclude any finding that the substance was "beta iodine" is plainly wrong. *See Meade*, 74 Va. App. at 805-06.

## B. DFS Laboratory Testing

The appellant contests the proof of the chain of custody at the DFS lab due to "doubts" about who analyzed the blood.[13] He notes that the "examiner" who testified at trial "did not bring [the] file since she was no longer working for the lab," and he suggests that without the file, the certificate of analysis was "useless." He argues that the certificate and any derivative evidence must be excluded. The appellant relies on two interrelated legal points. He first cites the authentication requirements of Virginia Rule of Evidence 2:901. Second, he acknowledges the substantial-compliance provisions of Code § 18.2-268.11 but points to the principle that "the Commonwealth must prove every 'vital link' in the chain of custody." He suggests that substantial compliance was not achieved because a vital link in the chain was missing and, consequently, that the certificate was improperly admitted. [14]

With respect to blood analysis in a DUI case, Code § 18.2-268.11 addresses the steps in Code §§ 18.2-268.2 through -268.9 "relating," in part, to "handling" and "identifying" blood samples. It establishes that those "steps . . . are procedural and not substantive." Code § 18.2-268.11. Code § 18.2-268.11 further provides that "[s]ubstantial compliance" with those procedures "shall be sufficient" and any "[f]ailure to comply with any steps or portions

---

[13] The appellant did not argue below that the Confrontation Clause or any constitutional or statutory principle other than those in Code §§ 18.2-268.5 and -268.11 supports his assignment of error. *See Hicks v. Commonwealth*, 60 Va. App. 237, 245 n.2 (2012) (holding under Rule 5A:18 that a hearsay objection did not preserve a Confrontation Clause objection for appeal); *see also Bethea v. Commonwealth*, 297 Va. 730, 743 (2019) (requiring that an objection must be "specific . . . so that the trial judge would know the particular point being made in time to do something about it" (emphasis omitted) (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011))). His chain-of-custody arguments on brief in this Court also do not present such a claim on appeal. *See* Rule 5A:20(e); *cf. Jay v. Commonwealth*, 275 Va. 510, 518-20 (2008) (permitting an appellate court to consider an assertion for which the appellant does not present legal authority as waived if that failure is significant). Consequently, we address only his chain-of-custody arguments.

[14] The appellant also cites Code § 18.2-268.5. That statute, however, is limited to the circumstances under which blood is drawn, not analyzed.

thereof . . . shall go to the weight of the evidence" rather than its admissibility. To the extent a defendant contests compliance with those procedures, the statute permits the defendant to challenge the test results by "introduc[ing] evidence" of "noncompliance" and arguing that "his rights were prejudiced" as a result. *See id.*

We hold that the challenged certificate of analysis was properly admitted under substantial compliance principles authorized by law. Mika Smith, a DFS employee at the time she signed the certificate's attestation clause as the examiner, testified at trial. Smith provided a detailed explanation of how evidence was received in and processed by the DFS lab where the appellant's blood sample was tested. She explained that the toxicology section "work[ed] kind of like . . . an assembly line" and that "different people c[ould] do different analyses." Smith further testified that only eight or nine people worked in that section. Any of them could have performed the test, and all of them had "undergo[ne] a rigorous training program," including competency and proficiency testing. *See generally Branham*, 283 Va. at 282 (recognizing the principle that the Commonwealth is entitled to "a presumption that everyone performs his official duties" "until the contrary is shown"). She additionally confirmed that no one else would have had access to the blood or the test results. Specifically, Smith explained that her job as the signer of the certificate was to look at all of the data "with the [specific] case" and "generate" the certificate "based [on] that data." Although Smith did not know whether she personally tested the appellant's blood, she was the official "examiner" for the appellant's case.[15] She examined

---

[15] Smith explained that she could have been the person who performed the blood alcohol test but that she could not be certain because she no longer had access to the file containing that information.

the data produced as a result of the laboratory's analysis and "ma[d]e sure all of the data ma[de] sense" and "passe[d] all of [DFS's] quality control criteria."[16]

This evidence was adequate under substantial compliance principles to support the trial court's admission of the certificate of analysis over the appellant's chain-of-custody objection. Further, the appellant highlighted the absence of evidence regarding who actually performed the BAC analysis, but he did not request a continuance to obtain the laboratory's records or articulate any specific claim of prejudice. *See* Code § 18.2-268.11 (permitting a defendant who contests compliance with the statutory scheme to challenge the test results by "introduc[ing] evidence" of "noncompliance" and arguing that "his rights were prejudiced" as a result). We hold that under these circumstances, the certificate was admissible and it was up to the trier of fact to determine what weight to give it.

### III. Sufficiency of the Evidence

The appellant's only challenge to the sufficiency of the evidence hinges on his assertion that the certificate of blood alcohol analysis was inadmissible. Because we conclude that the certificate was properly admitted, we do not address his limited sufficiency challenge. *See Rozario v. Commonwealth*, 50 Va. App. 142, 146 (2007) (en banc) (holding that the defendant's sufficiency argument was moot because its sole "premise—that the [BAC] results were admitted in error—[was] untrue").

### CONCLUSION

We hold that the trial court did not err by denying the appellant's motion to suppress evidence or admitting the certificate of blood alcohol analysis over his chain-of-custody objections.

---

[16] Smith further testified that after this procedure, the case would have been reviewed again by "a separate person who did not touch the test at all." That person would "make sure of the same things, that everything passe[d] and that the certificate c[ould] be generated based [on DFS's] standard operating procedures."

Finally, we reject his narrow challenge to the sufficiency of the evidence because the certificate of analysis was admissible.  Accordingly, we affirm the challenged conviction.

*Affirmed.*